UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JACQUELINE GENES, Personal Representative
Of the Estate of Wilbert C. Alexander, Deceased

      Plaintiff,

vs.                                                   Case No. 25 - cv
                                                      Hon.

UNITED STATES OF AMERICA,

      Defendant
_____/
KYLE KELLY (P69863)
STEFFANI CHOCRON (P45335)
LIPTON LAW CENTER, P.C.
Attorneys for Plaintiff
18930 W. Ten Mile Road
Southfield, Michigan 48075
(248) 557-1688
kyle@liptonlaw.com
_____/

**COMPLAINT**

      COMES NOW Plaintiff by and through counsel and for this complaint against this Defendant states as follows:

**PARTIES AND JURISDICTION**

**INTRODUCTION**

      1.      This is an action against the Defendant United States under the Federal Tort Claims Act, (28 U.S.C. Section 2671, *et seq.*) and 28 U.S.C. Section 1346(b)(1), for negligence in connection with medical care provided to Plaintiff's decedent

Wilbert C. Alexander by the John D. Dingell Veterans Medical Center (hereinafter JDVMC) staff agents and employees, including but not limited to Nicholas A. Lewis, MD and any other unidentified technicians or aides, involved in the care and treatment of Mr. Alexander.

2. The claims herein are brought against the Defendant pursuant to the Federal Tort Claims Act (28 U.S.C. Section 2671 *et. Seq.*) and 28 U.S.C. Section 1346(b)(1), for money damages as compensation for personal injuries and wrongful death caused by the Defendants' negligence.

3. Plaintiff Wilbert Alexander, by his personal representative, Jacqueline Genes has fully complied with the provisions of 28 U.S.C. Section 2675 of the Federal of the Federal Tort Claims Act.

4. This suit has been timely filed, in that Plaintiff, through his representative, timely served notice of his claim on the Department of Veterans Affairs, less than two years after the incident forming the basis of this suit.

5. Plaintiff Jacqueline Genes, in her capacity as Personal Representative of the Estate of her father, Wilbert Alexander, deceased, is now filing this Complaint pursuant to 28 U.S.C. Section  Section 2401(b), 2675(a) as more than 6 months have passed since the filing of the Form 95 with the Defendant and no settlement has been reached.

SHRR\6280886v1

## PARTIES AND JURISDICTION

6. Plaintiff's decedent, Wilbert Alexander, was at all times, a resident of Pontiac, Oakland County in the State of Michigan.

7. Defendant United States of America is liable for the errors, acts and omissions of the VAAAHS and its employees, including specifically including Nicholas A. Lewis, MD, as well as any radiology technician or aide, who provided care and treatment to the decedent in the relevant time period, pursuant to 42 USC 233 (g)-(h), 42 USC 233(A) and 28 USC 2679(b).

8. Nicholas A. Lewis is a licensed physician, specializing in and at all relevant times, practicing in the field of Diagnostic Radiology.

9. Matina Pruitt is a registered technologist in radiology, acting at all relevant times as a radiologist technician. Upon information and belief, Matina Pruitt was the technician responsible for overseeing the radiology aide when Mr. Alexander was injured.

10. "Gloria" (last name unknown to Plaintiff, but known to Defendant), was the aide to the radiologist technician, responsible for assisting the technician when Mr. Alexander was injured.

11. At all times relevant to this Complaint, JDVMC, Dr. Lewis and the radiology technicians, whether Pruitt, "Georgia" or otherwise, held themselves out to the Plaintiff's decedent and eligible beneficiaries, as providers of high quality

health care services with the obligation to maintain the health and safety of patients like the Plaintiff.

12. At all times relevant to this action, Dr. Lewis and the radiology technicians, whether Pruitt, "Georgia" or otherwise, were acting in the course and scope of their employment with the JDVMC.

13. Affidavits of Merit of Dr. William Hoddick, MD is attached as Exhibit 1 and Colleen Hoffman, RT, MRSO is attached to this Complaint as Exhibit 2.

14. This Court has original subject matter jurisdiction based upon a Federal Question being raised under the constitution and laws of the United States, pursuant to 28 U.S. § 1331.

15. The events or omissions giving rise to the Plaintiff's claims happened in the Eastern District of Michigan. Accordingly, venue is proper in this district pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

16. Plaintiff incorporates all prior allegations as if fully set forth herein.

17. This case arises out of the failures of the named medical care providers to follow any reasonable standard of care, by failing to ensure Mr. Wilbert Alexander's safety and securing him to the radiology table during radiologic testing on 4/17/23, resulting in multiple traumatic injuries and death from those injuries on 4/26/23.

18. On 4/17/23, U.S. armed forces veteran Wilbert Alexander presented to the outpatient radiology department at the John D. Dingell VA Medical Center (VA) to undergo X-rays of his right foot/ankle and right shoulder, as ordered by his rheumatologist Raai Mahood, MD. He was also to undergo a chest X-ray, ordered by Danyelle Armour, NP, and a screening ultrasound of his abdomen, ordered by Tasondra Foltz, NP.

19. On 4/17/23 at 11:59, an ultrasound of the abdomen was performed.

20. On 4/17/23 at 12:55, the X-rays of Mr. Alexander's right foot/ankle, right shoulder, and chest were performed. The foot/ankle studies were evaluated and interpreted by radiologist Nicholas A. Lewis, MD, who was noted to be "Primary Interpreting Staff."

21. The chest and shoulder studies were evaluated and interpreted by radiologist Walter Osias, MD, presumably via the VHA National Teleradiology Program, an outside radiology service.

22. The identification of the radiology assistant/technician is not noted in the medical record other than illegible handwritten initials on documents titled "Rad/NM Consultation for RADIOLOGY OUTPATIENT" that corresponded to each of the X-ray studies of his right foot/ankle, right shoulder, and chest.

23. Following the herein described incident, Matina Pruitt, a radiologist technician, prepared a report of the incident. Upon information and belief, Martina

Pruitt was the radiology technologist responsible for Mr. Alexander at the relevant time.

24. Further, "Georgia" is described by Matina Pruitt as the aide in the room with the Plaintiff's decedent. Defendant knows, or should know, her full identity.

25. On 4/17/23 while undergoing radiologic testing at the John D. Dingell VA Medical Center, Mr. Alexander was allowed to tumble from the X-ray table.

26. Mr. Alexander was transported to the Emergency Department (ED) within the facility.

27. On 4/17/23 at 15:30, ED nurse Kathy Ferguson, RN noted that Mr. Alexander presented to the ED on a stretcher, and "pt stated fell off x-ray table." Mr. Alexander complained of right shoulder, right hip, and rib pain; he denied striking his head. He was noted to be alert and oriented x 4.

28. On 4/17/23 at 16:12, ED physician Robert Faber, DO noted that Mr. Alexander was at the hospital on this date to have X-rays of his foot and ankle. Dr. Faber noted "For an unknown reason, he fell off the x-ray table onto the tile floor and now sent to ED because of injuries from this fall."

29. Dr. Faber noted that Mr. Alexander reported pain in his right shoulder and that a verbal report by the radiology department indicated that Mr. Alexander may have had a rib fracture from the fall.

30. Mr. Alexander denied head injury, headache, neck pain, or loss of consciousness in the event.

31. On exam Mr. Alexander was noted to have flexion contractures to his extremities which were clearly phonic. He had normal respiratory movement, no dyspnea, lungs clear on exam. His right shoulder was tender to exam and he reported pain to the right lateral chest wall. There was no hip pain on exam. Dr. Faber noted that Mr. Alexander was alert and oriented x 3.

32. Dr. Faber placed orders for X-rays and a dose of Dilaudid.

33. On 4/17/23 at 16:16, multiple X-ray studies were performed and revealed the following:

- Right shoulder revealed a minimally displaced fracture of the acromial process.
- Right humerus revealed no acute fracture or dislocation. Right rib fractures were identified.
- Right hip revealed cortical step-off in the right superior pubic ramus, which may represent minimally displaced fracture. Consider CT pelvis for further assessment.
- Rib X-rays revealed the following:
  - LINES/ TUBES/FOREIGN BODIES: Retained metallic bullets project over the right lower right chest and left lower abdomen. Metallic marker projects over the right chest.

  - LUNGS/ AIRWAYS: Reticular opacities in the bibasilar lungs viable with chronic fibrotic interstitial lung disease . No new pulmonary contusion

  - PLEURA: No pleural effusion. No visible pneumothorax accounting for suboptimal supine technique due to patient ' s inability to be seated upright.

  - MEDIASTINUM AND HEART: The cardiomediastinal silhouette is prominent in size but unchanged. Similar pulmonary vascular enlargement .

- BONES: New acute mildly displaced fracture of the lateral right 6th rib. Partially imaged posterior fusion of the lower cervical spine.

34. On 4/17/23 at 17:35, ED nurse Kathy Ferguson, RN, noted that Mr. Alexander had returned from X-ray and was lying on the cart. RN Ferguson noted that he was relaxed with even and unlabored respirations, skin warm and dry.

35. On 4/17/23 at 18:25, a CT of the pelvis was performed and revealed the following: "Mildly displaced fracture right superior pubic ramus near the pubic symphysis. Nondisplaced fracture right hemi-sacrum and right posterior ilium. Ill-defined blood/hematoma in the anterior pelvic extraperitoneal space, asymmetric right. Infrarenal aortic aneurysm measuring 4.4-4.5 cm, similar to prior CT. Rectum moderately distended with stool. IMPRESSION: **Multiple right- sided pelvic fractures**."

36. On 4/17/23 at 19:51, Dianne Gouin, RN recorded Mr. Alexander's vital signs as 106/91, 94, 32, 102.2 axillary, pulse oximetry 87% 2LNC.

37. On 4/17/23 at 19:55, Dianne Gouin, RN noted that her initial contact with Dr. Alexander was at 19:35 and that he was resting and answering to name only. She noted that Mr. Alexander asked for a supervisor and did not want to be disturbed. Unable to evaluate pain. Dr. Faber was made aware of current vital signs.

38. On 4/17/23 at 20:00, Dianne Gouin, RN recorded Mr. Alexander's vital signs as 80/47, 80, 36, pulse oximetry 86% 4L NC. It was noted that pulse oximetry was difficult to obtain.

39. On 4/17/23 at 20:00, Dr. Faber noted that Mr. Alexander had remained stable until this point in his ED visit when his oxygen saturation dropped to 88-89% and his temperature had gone up to 102.2F axillary. Dr. Faber noted that he called Respiratory Therapy to come to the ED and assist with oxygenation to an oxygen saturation of 92%. A dose of Tylenol was ordered. A urinalysis was ordered. Blood tests were unremarkable and the WBC was 10.6. COVID- 19 test was negative.

40. Dr. Faber noted "I do feel the most likely cause for his drop in pulse ox (is that the) x-ray shows because of a possible pulmonary contusion related to his rib fracture." Dr. Farber also noted that Mr. Alexander's blood pressure had dropped down to 89/54.

41. Dr. Faber noted that Mr. Alexander would need to be transferred to another medical facility, noting that Mr. Alexander's hypotension could be the result of blood loss related to his pelvic fractures. One liter of normal saline bolus was ordered, and Dr. Faber applied a sheet as a pelvic binder. A dose of Levaquin had been ordered.

42. On 4/17/23 at 20:05-21:25, a normal saline fluid bolus of 1000mL was given by Dianne Gouin, RN.

43. On 4/17/23 at 20:14, Dianne Gouin, RN recorded Mr. Alexander's vital signs as 89/54, 85, 36, pox 88% 4LNC.

44. On 4/17/23 at 20:24, Dianne Gouin, RN recorded Mr. Alexander's vital signs as 122/94, 87, 36, pox 89% 5LNC.

45. Mr. Alexander was requiring increasing oxygen to maintain an inadequate pulse oxygenation level.

46. On 4/17/23 at 20:30, Levofloxacin 500mg in 100ml IVPB was given by Dianne Gouin, RN.

47. On 4/17/23 at 20:34, Dianne Gouin, RN recorded Mr. Alexander's vital signs as 95/55, 88, 32, pulse ox 90% on 40% VM (Venturi mask).

48. On 4/17/23 at 21:12, Dianne Gouin, RN recorded Mr. Alexander's vital signs as 95/61, 84, 32, pulse ox 99% on 40% VM.

49. On 4/17/23 at 21:20, Dianne Gouin, RN noted that Mr. Alexander was awake but did not want to be disturbed. A Foley catheter was placed with return of 75cc of urine. Urinalysis was obtained. RN Gouin noted she was unable to place Tylenol rectally and Dr. Faber was aware. Report was given to Chris RN for Henry Ford Hospital in Detroit at 20:52.

50. On 4/17/23 at 21:29, Dianne Gouin, RN recorded Mr. Alexander's vital signs as 95/53, 112, 36, pulse ox 97% on 40% VM.

51. On 4/17/23 at 21:35, urinalysis results revealed turbid urine with positive leukocyte esterase and high RBC.

52. On 4/17/23 at approximately 21:50, Mr. Alexander was transported via ambulance to Henry Ford Medical Center in Detroit for escalation of care related to multiple acute traumatic injuries.

53. On 4/17/23 at 22:13, ED physician Gina Hurst evaluated Mr. Alexander and noted that his vitals were remarkable for **BP 66/26** and temperature 38.4C. He was given 2L Lactated Ringers and placed on a Norepinephrine IV with a good response to systolic blood pressure in the 100s. Venous blood gases showed pH 7.26 with lactate 2.1. WBC 9.8 and elevated creatinine 1.6 with unclear baseline.

54. Mr. Alexander was alert and oriented with diffuse musculoskeletal pain. A Foley catheter was placed with reported purulent output. A urinalysis was grossly positive for urinary tract infection, and antibiotics were started. Mr. Alexander was admitted to the ICU.

1. On 4/17/23 at 23:25, a CT scan of the chest, abdomen, pelvis, and thoracic and lumbar spine revealed the following:**Comminuted and displaced fracture of the right pubic bone and mildly displaced fracture of the right sacral ala**. The pubic symphysis and SI joints are maintained. **There is hemorrhage and free fluid surrounding the right pubic bone fracture and the bladder**. There is no evidence of active bleeding.
2. **Diffuse wall thickening of the bladder which is collapsed incompletely evaluated.** Given pelvic fractures and surrounding fluid and hemorrhage, bladder injury cannot be excluded. This can be evaluated with cystogram as clinically indicated.
3. **Mildly displaced fracture of the right fifth rib**. There is irregular lucency surrounding **the posterior right sixth rib near the costovertebral junction which is suspicious for nondisplaced fracture**. Correlate with point tenderness. No pneumothorax.
4. Chronic appearing anterior wedge deformity of the vertebral body of L1 with 50% height loss. No acute osseous abnormality in the

      thoracic or lumbar spine. No high-grade central canal stenosis.
5. **Fat stranding and fluid with multiple foci of gas in the proximal left forearm** which is partially visualized. Correlate clinically for any evidence of injury. This could be further evaluated with radiographs.
6. Fusiform aneurysmal dilation of the infrarenal abdominal aorta which measures up to 4.8 cm. There is ectasia of the bilateral common iliac arteries.
7. Age indeterminant occlusion of the left superficial femoral artery.
8. Findings of interstitial lung disease, progressed from 2005.

55. On 4/18/23 at 01:19, Mr. Alexander was evaluated by orthopedic specialist Ali Mehaidli, MD. He was unable to complete a full evaluation due to Mr. Alexander's severe pain and "difficulty breathing." Dr. Mehaidli noted that no acute orthopedic intervention was indicated and that Orthopedics would perform a secondary examination.

56. On 4/18/23 at 05:11, ICU resident Ryan Miller, MD entered a History and Physical note stating that upon arrival in the ICU, Mr. Alexander's BP was 101/87, heart rate 61, with tenuous pulse oximetry measurements on 6L nasal cannula. Mr. Alexander was agitated, reporting pain everywhere, yelling at the ICU team. His mental status became altered and he was noted to be alert and oriented x 0, he did not know his name. GCS 14, intermittently following commands. He endorsed pain everywhere including his chest and abdomen; he also endorsed shortness of breath. Tender to palpation everywhere, with increased tenderness in the right chest. Dr. Miller contacted Mr. Alexander's emergency contact, who reported that his cognition was intact at baseline, AOx4. Upon return from CT, Mr. Alexander's work of breathing had notably increased, he was wheezing throughout

and had a limited response to breathing treatment. Arterial blood gases were obtained with pH 7.29, pCO2 45.2, pO2 48.8. He was placed on a non-rebreather oxygen mask.

57. On 4/19/23 at 08:45, a chest X-ray showed enlarged cardio-mediastinal silhouette and diffuse interstitial and patchy opacity throughout the lungs, greatest at the bases.

58. On 4/19/23, Mr. Alexander developed an arrhythmia, complete heart block, which required the placement of a transvenous pacemaker. That afternoon, his respiratory status declined further and he was intubated. He was started on stress dose steroids.

59. On 4/21/23, Mr. Alexander remained intubated in the ICU. A chest X-ray on this date showed stable patchy interstitial and airspace opacities within the lungs bilaterally and small bilateral pleural effusions.

60. On 4/23/23, a PICC line was placed due to multiple incompatible IV medications requiring central access and frequent blood draws. An EEG performed on this date showed metabolic encephalopathy, no seizures.

61. On 4/24/23, Mr. Alexander was extubated and was placed on 3L O2 per nasal cannula. His family changed his code status to "Do Not Resuscitate," and he was transferred out of the ICU and to the telemetry floor.

62. On 4/26/23, Mr. Alexander passed away at Henry Ford Medical Center.

63. On 4/27/23, an autopsy was performed by Nicole Croom, MD at the Wayne County Medical Examiner's Office. Dr. Croom's opinion was that death was caused by "blunt force trauma to the torso and pelvis with complications, with contribution from congestive heart failure, and the manner of death is accident."

64. As a direct and proximate result of the events described herein, Mr. Alexander endured conscious pain and suffering, and his Estate incurred funeral and burial expenses and incurred medical expenses. Further, his survivors, including his children, suffer and continue to suffer from the loss of his society and companionship.

## COUNT 1
## CAUSE OF ACTION FOR MEDICAL MALPRACTICE

65. Plaintiff incorporates all prior allegations as if fully set forth herein.

66. The Defendant USA, as the real party in interest for JDVMC and Dr. Nicholas, Matina Pruitt, "Georgia," and any other employees who were, or should have been involved in providing appropriate care for Mr. Alexander, had a duty to provide ordinary care, and to exercise that standard and degree of care and skill required of health care providers, consistent with the expertise that the Defendants presented to the community at large.

67. The standard of care required JDVMC through its agents, employees and staff and in particular through Dr. Nicholas, Matina Pruitt and any other radiology technicians or aides as reasonable and prudent physicians and technicians

offering services in diagnostic radiology, when offering standard radiology services to a patient such as Wilbert Alexander, to:

    a. Exercise that degree of reasonable clinical judgment and provide appropriate care that a reasonable supervising Radiologist or radiology technician would under the same or similar circumstances;
    b. Recognize that a fall from a stretcher and radiologic procedure table can result in serious injuries, and that precautions should be put in place and implemented to prevent traumatic fall injuries;
    c. Ensure that a patient undergoing a radiologic examination is safely secured to the stretcher or procedure table for the duration of the examination;
    d. For patients who undergo radiologic examination, ensure that information regarding their physical and mental status be provided as part of the patient hand- off process.
    e. Ensure that radiology staff are trained and educated on fall prevention strategies, and implement same, and that they can demonstrate the ability to recognize patient fall risks;
    f. Ensure that radiology technicians/assistants report and document the details of a fall incident, including the distance a patient falls from a stretcher or procedure table, whether there was loss of consciousness or impaired memory of the event, the patient's position when the fall occurred, complaints of headache or vomiting, and obvious signs of trauma (e.g. fracture, deformity, laceration, bruising, redness, swelling, point tenderness);
    g. Ensure that a Rapid Response is called when a patient experiences a traumatic fall and when the extent of injuries is not yet known;
    h. Ensure that a "never event," such as a fall from a radiologic procedure table, is reported to the appropriate external agency and that a root-cause analysis is conducted to determine how and why the event occurred;
    i. Other standards as shall be revealed in discovery.

68. As a direct and proximate result of the violations of the standards of care referenced above, Defendant, by and thru JDVMC, Dr. Nicholas, Matina Pruitt, "Georgia," and/or any other radiology technicians or aides, among other employees,

allowed Mr. Alexander to tumble from the radiology table, resulting in the injuries previously alleged and his subsequent death.

## COUNT 2
## CAUSE OF ACTION FOR ORDINARY NEGLIGENCE UNDER MICHIGAN LAW

69. Plaintiff incorporates allegations 1-64 as if fully set forth herein.

70. At all times, Defendant, by and thru Matina Pruitt, "Georgia," or any other radiology technicians or aides, had an obligation to use ordinary care to ensure that their patient did not tumble off the radiology table, when setting the patient up for diagnostic radiology testing.

71. Defendant, by and thru Matina Pruitt, "Georgia," or any other radiology technicians, failed to exercise ordinary care, in that they failed to take reasonable steps to ensure that Mr. Alexander was safely placed on, and in a stable, secured position, such that the "never event" of a fall from a diagnostic radiology table would not occur.

72. As a direct and proximate result of the failure of the Defendant, by and thru its employees, to exercise ordinary care, Mr. Alexander was allowed to tumble from the table, suffering the injuries and death previously described.

WHEREFORE Plaintiff requests the following relief;

A. Compensatory non-economic and economic damages including but not limited to all damages recoverable under the laws of the United States, and of the State of Michigan;

B. Reasonable attorney fees, costs and interest;

C. Such other and further relief as appears reasonable and just under the circumstances.

Respectfully submitted,

By /s/ Kyle Kelly
KYLE KELLY (P69863)
Attorneys for Plaintiff
18930 W, 10 Mile Road
Southfield, Michigan 48075
Dated: April 1, 2025 (248) 557-1688